1   Sam S. Puathasnanon
    Cal. Bar No. 198430
2   Email: puathasnanons@sec.gov
    Sana Muttalib
3   Cal Bar. No. 267005
    Email: muttalibs@sec.gov
4

5   Attorneys for Plaintiff
    Securities and Exchange Commission
    Michele Wein Layne, Regional Director
6   Lorraine B. Echavarria, Associate Regional Director
7   John W. Berry, Regional Trial Counsel
    444 S. Flower Street, Suite 900
8   Los Angeles, California 90071
    Telephone: (323) 965-3998
9   Facsimile: (213) 443-1904

10

11               **UNITED STATES DISTRICT COURT**

12                  **DISTRICT OF ARIZONA**

13

14   Securities and Exchange Commission,     Case No.

15          Plaintiff,                  **COMPLAINT**

16           vs.

17   Janus Spectrum LLC; David Alcorn;
    Kent Maerki; Dominion Private Client
18   Group, LLC; Janus Spectrum Group,
    LLC; Spectrum Management, LLC;
19   Spectrum 100, LLC; Spectrum 100
    Management, LLC; Prime Spectrum,
20   LLC; Prime Spectrum Management,
    LLC; Daryl G. Bank; Premier
21   Spectrum Group, PMA; Bobby D.
    Jones; Innovative Group, PMA;
22   Premier Group, PMA; Prosperity
    Group, PMA; Terry W. Johnson; and
23   Raymon G. Chadwick, Jr.,

24          Defendants.

25

26

27

28

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY

1.      This matter involves a securities offering fraud orchestrated by Defendants David Alcorn and Kent Maerki, through the company they founded and managed, Defendant Janus Spectrum LLC ("Janus Spectrum").  Janus Spectrum held itself out as a company that prepares applications for Federal Communications Commission ("FCC") cellular spectrum licenses on behalf of third party fundraising entities.  Alcorn and Maerki organized the business so that the fundraising entities, owned and managed by Defendants Daryl Bank, Bobby Jones, Terry Johnson, and Raymon Chadwick, offered and sold securities purporting to raise funds to apply for FCC licenses.  In these offerings, Defendants misled investors by promising that their investments would yield substantial returns through the sale or lease of the FCC licenses to major wireless carriers, when in fact, Defendants knew or were reckless or negligent in not knowing that the FCC licenses, if obtained, could never be sold or leased by any major wireless carriers.  Defendants further concealed the actual costs associated with obtaining these FCC licenses, and pocketed substantial sums of investor moneys for their own, undisclosed, uses.

2.      In all, the fundraising entities controlled by Bank, Jones, Johnson, and Chadwick raised over $12.4 million from investors from May 2012 through October 2014.  After collecting and pooling these investor funds, the fundraising entities funneled a significant percentage of the funds to Janus Spectrum, Alcorn, and Maerki, with only a small portion of these funds used to prepare applications for FCC licenses.  Alcorn and Maerki kept the remainder of the investor funds for personal use.  In all, Janus Spectrum received at least $6,834,700 from the fundraising entities. Of that amount, Alcorn received at least $514,996, and Maerki received at least $867,665 of investor funds.  Bank paid himself and his other businesses approximately $4,494,900 out of investor funds.  Jones received approximately $622,700 from investor funds and referral fees from Janus Spectrum.  Chadwick and

1

Johnson received approximately $456,483 from investor funds and referral fees from Janus Spectrum.

3.     By conducting this fraudulent scheme and lying to investors, Defendants violated the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and the broker-dealer registration provisions of Section 15(a)(1) of the Exchange Act.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)], and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa].

5.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

6.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Janus Spectrum's principal place of business is in this district and Alcorn and Maerki reside in this district.

## DEFENDANTS

**A.     The Janus Spectrum Defendants**

7.     **Janus Spectrum** is a New Mexico limited liability company, formed in October 2011, with its principal place of business in Glendale, Arizona.  Janus

Spectrum holds itself out to be an FCC license application services company. Janus Spectrum has not registered any offerings of securities under the Securities Act, nor has it registered a class of any securities under the Exchange Act.

8. **David Alcorn**, age 70, of Scottsdale, Arizona is a founder and managing director of Janus Spectrum. Alcorn is the president of David Alcorn Professional Corporation, which became the sole owner of Janus Spectrum as of January 2014. Prior to January 2014, David Alcorn Professional Corporation held a 55% ownership interest in Janus Spectrum.

9. **Kent Maerki**, age 72, of Scottsdale, Arizona is a founder and former owner of Janus Spectrum. Until January 2014, Maerki held a 45% ownership interest in Janus Spectrum. Maerki is currently a consultant to Janus Spectrum.

**B.     The Fundraising Entity Defendants**

10.     The top fundraising entities for Janus Spectrum and their respective principals were: (1) Dominion Private Client Group, LLC ("Dominion Private Client Group"), Janus Spectrum Group, LLC ("Janus Spectrum Group"), Spectrum Management, LLC ("Spectrum Management"), Spectrum 100, LLC ("Spectrum 100"), Spectrum 100 Management, LLC ("Spectrum 100 Management"), Prime Spectrum, LLC ("Prime Spectrum"), and Prime Spectrum Management, LLC ("Prime Spectrum Management")—Daryl Bank; (2) Premier Spectrum Group, PMA ("Premier Spectrum Group")—Bobby Jones; and (3) Innovative Group, PMA ("Innovative Group"), Premier Group, PMA ("Premier Group"), and Prosperity Group, PMA ("Prosperity Group")—Terry Johnson and Raymon Chadwick (collectively, the "Fundraising Entities").

**1.     The Bank Defendants**

11.     **Daryl G. Bank**, age 44, of Port St. Lucie, Florida is the managing member of Dominion Private Client Group. Bank is the managing member of Janus Spectrum Group, Spectrum 100, and Prime Spectrum through his entities Spectrum Management, Spectrum 100 Management, and Prime Spectrum Management

respectively (collectively with Bank and Dominion Private Group, the "Bank Defendants").

12.   **Dominion Private Client Group** is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia.  Dominion Private Client Group offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Dominion Private Client Group has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

13.   **Janus Spectrum Group** is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia.  Janus Spectrum Group offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Janus Spectrum Group has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

14.   **Spectrum Management** is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia.  Spectrum Management is the managing member of Janus Spectrum Group.  Spectrum Management has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

15.   **Spectrum 100** is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia.  Spectrum 100 offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Spectrum 100 has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

16.   **Spectrum 100 Management** is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia.  Spectrum 100 Management is the managing member of Spectrum 100.  Spectrum 100 Management has not registered any offerings of securities under the Securities Act, nor has it

registered a class of securities under the Exchange Act.

17.   **Prime Spectrum** is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia.  Prime Spectrum offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Prime Spectrum has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

18.   **Prime Spectrum Management** is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia.   Prime Spectrum Management is the managing member of Prime Spectrum.  Prime Spectrum Management has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

### 2.    The Jones Defendants

19.   **Bobby D. Jones**, age 68, of Phoenix, Arizona, is the founder and trustee of Premier Spectrum Group (collectively with Jones, the "Jones Defendants").

20.   **Premier Spectrum Group** is a Texas private membership association with its principal place of business in Phoenix, Arizona.  Premier Spectrum Group offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Premier Spectrum Group has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

### 3.    The Johnson/Chadwick Defendants

21.   **Terry W. Johnson**, age 57, of Heath, Texas, is co-founder of Innovative Group, Premier Group, and Prosperity Group.  In addition, Johnson is a principal trustee and managing member of Premier Group, and is the principal trustee and managing member of Prosperity Group.

22.   **Raymon G. Chadwick, Jr.**, of Grand Prairie, Texas, age 60, is co-founder of Innovative Group, Premier Group, and Prosperity Group (together with Johnson and Chadwick, the "Johnson/Chadwick Defendants").  In addition,

Chadwick is the principal trustee and managing member of Innovative Group, and is a principal trustee and managing member of Premier Group.

23.     **Innovative Group** is a Texas private membership association with its principal place of business in Grand Prairie, Texas.  Innovative Group offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Innovative Group has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

24.     **Premier Group** is a Texas private membership association with its principal place of business in Grand Prairie, Texas.  Premier Group offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Premier Group has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

25.     **Prosperity Group** is a Texas private membership association with its principal place of business in Heath, Texas.  Prosperity Group offered and sold securities in connection with acquiring and monetizing FCC licenses for 800 MHz spectrum.  Prosperity Group has not registered any offerings of securities under the Securities Act, nor has it registered a class of securities under the Exchange Act.

## STATEMENT OF FACTS

### A.     The 800 MHz Wireless Spectrum

26.     Among other things, the FCC regulates wireless communications.  It does so in part through its oversight of the various frequencies that comprise the country's available wireless capacity, or spectrum.  The FCC issues licenses to use the various frequencies throughout the country.  The most common licenses involve transmitting radio, television, and cellular telephone signals on certain frequencies.

27.     In 2004, the FCC adopted a plan to reconfigure the 800 MHz portion, or band, of the wireless spectrum.  This plan was designed to address increasing interference problems with the operation of public safety communication systems using the 800 MHz band caused by the operation of closely situated high-density

6

commercial wireless systems.

28.     The plan separated the frequencies on which public safety systems operate from the frequencies on which commercial wireless carriers operate by moving public safety operations to the lower portion of the 800 MHz band and moving commercial wireless systems to the higher portion of the band.

29.     As part of its plan, the FCC established the Expansion Band and Guard Band to provide public safety licensees with a buffer from the cellular portion of the band.  The Expansion Band and Guard Band each provide one MHz of separation from the cellular portion of the band.

30.     The FCC's rules specify that a licensee using an Expansion Band or Guard Band channel is only authorized to use a maximum bandwidth of 20 kilohertz (20 thousand Hertz).

31.     Major wireless carriers such as Sprint currently use technology for cellular voice and data services that require a minimum bandwidth of 1.25 megahertz (1.25 million Hertz) to 1.4 megahertz (1.4 million Hertz).  Thus, the FCC would not permit major wireless carriers to operate their cellular services on the 800 MHz Expansion Band or Guard Band because those services would not fit within the FCC's authorized maximum bandwidth of 20 kilohertz.  This remains true regardless of whether these major wireless carriers buy or lease the licenses from others.

**B.     The Investment Scheme**

32.     Janus Spectrum, Alcorn, and Maerki orchestrated an investment scheme involving them, the Bank Defendants, the Jones Defendants, and the Johnson/Chadwick Defendants, disguised as a business seeking to obtain and monetize FCC licenses in the Expansion Band and Guard Band.

**1.     Role of the Janus Spectrum Defendants in the scheme**

33.     Janus Spectrum's business had two parts, each of which played a part in the investment scheme.

34.     The first part of Janus Spectrum's business involved offering and

providing FCC license application services to over 20 fundraising entities, including all of the Fundraising Entity Defendants, which Janus Spectrum called "clients." These application services included working with third parties, such as engineers and attorneys, to prepare and file spectrum applications with the FCC.

35.    Janus Spectrum prepared applications for 800 MHz spectrum in the Expansion Band and Guard Band.  These bands represented the only spectrum that non-public safety entities could apply for in the 800 MHz band from January 2013 through the present.  As the FCC began releasing blocks of licenses, Janus Spectrum submitted a number of applications, and as a result, some of the Fundraising Entities received licenses.

36.    The second part of Janus Spectrum's business involved encouraging investment in the Fundraising Entities.  From the inception of Janus Spectrum, Alcorn and Maerki created a layered investment scheme that structured the business, relationships, and written agreements with the Fundraising Entities to avoid the appearance that Janus Spectrum was offering securities.  Alcorn and Maerki relied on the Fundraising Entities to overtly offer securities, hoping to shield themselves from the registration requirements and potential liability associated with offering securities.

37.    Although the membership interests were offered and sold by the Fundraising Entities, Alcorn and Maerki were intimately involved in their offer and sale.

38.    Alcorn and Maerki each referred potential investors to the Fundraising Entities.  They participated in conference calls with potential investors.  They made presentations to potential investors regarding the investments in the Fundraising Entities.  They promised investors potential returns on the investment during in-person meetings or via email and telephone.  Alcorn and Maerki frequently encouraged the Fundraising Entities to use them to close sales.  Alcorn also answered investors' questions regarding the possible uses of the 800 MHz spectrum.

39.    Janus Spectrum, Alcorn, and Maerki also furthered the scheme through

numerous deceptive acts.  Alcorn and Maerki, among other things, encouraged and facilitated the setup and use of the Fundraising Entities.  They used the layered structure in an attempt to evade the securities laws, including the registration requirements.

40.     They also used the layered structure to funnel investor funds from the Fundraising Entities to Janus Spectrum and themselves.  From May 2012 to October 2014, the Fundraising Entities paid at least $6,834,700 to Janus Spectrum.  Of that amount, Alcorn received at least $514,996, and Maerki received at least $867,665 of investor funds, concealing from investors that the FCC license application costs were substantially less than the amount they were charging per application.  Alcorn and Maerki controlled how much of these funds they paid to themselves and as referral fees to Jones, Johnson, and Chadwick.  Defendants did not disclose to investors how much of their investment went to Alcorn, Maerki, Bank, Jones, Johnson, Chadwick or their entities instead of toward the costs of obtaining FCC license applications.

41.     In furtherance of their scheme, Alcorn and Maerki also made investor referrals to the Fundraising Entities.  They provided misleading videos entitled "Money from Thin Air" and "Educational Preview About Airwaves Presentation" to the Fundraising Entities for use in soliciting and deceiving investors.  They also provided sample offering documents to Bank which were virtually identical to the offering documents used by Jones.  All of these materials misrepresented the anticipated use and value of the 800 MHz spectrum licenses by promising that they could be sold or leased to major wireless carriers.  Further, these materials concealed the use of investor funds for referral fees, commissions, and payments to Alcorn, Maerki, Bank, Jones, Johnson and Chadwick.

42.     Alcorn and Maerki knew, or were reckless or negligent in not knowing, that they committed deceptive acts in furtherance of the fraudulent scheme.  Alcorn and Maerki knowingly supported the solicitation and sales efforts of the Fundraising Entities and controlled Janus Spectrum's bank accounts into which the Fundraising

1    Entities funneled investor funds.

2        43.    During the relevant time period, Alcorn and Maerki were owners and

3    managers of Janus Spectrum; thus, their knowledge that they committed deceptive

4    acts in furtherance of the fraudulent scheme is imputed to Janus Spectrum.

5            **2.    The Janus Spectrum Defendants' material misrepresentations**

6        44.    Janus Spectrum, Alcorn, and Maerki misrepresented the potential use of

7    the spectrum in the 800 MHz Expansion Band and Guard Band, the only type of

8    spectrum for which Janus Spectrum prepared applications.  Specifically, Alcorn and

9    Maerki represented to the Fundraising Entities and investors that the licenses Janus

10   Spectrum applied for could be used by major wireless carriers, such as Sprint, to

11   operate their cellular systems.

12       45.    Nonetheless, Alcorn falsely represented to investors that 800 MHz

13   spectrum in the Expansion Band and Guard Band could be used by major wireless

14   carriers like Sprint.  At least one potential investor asked which entities would want

15   to lease the spectrum being applied for by Janus Spectrum, and Alcorn responded

16   "The most likely user will be Sprint but the market is very deep."

17       46.    Maerki made the same misrepresentation to potential investors in two

18   video presentations.  In the first video, entitled "Money from Thin Air," Maerki

19   repeatedly touted the potential of the 800 MHz spectrum and misrepresented the use

20   of this spectrum by major wireless carriers.  Specifically, Maerki represented "Sprint

21   is going to need this [the 800 MHz spectrum] …But if they don't take it, AT&T

22   needs it, and so does Verizon.  More importantly T-Mobile really needs it.  So do the

23   other ones."

24       47.    Maerki emailed this video to the Fundraising Entities for their use and

25   directly to potential investors.  Maerki knew that the Fundraising Entities would use

26   the video to solicit investors when he sent the video.  For example, Jones sent Maerki

27   an email in which Jones clearly stated that he planned to use the video during a

28   webinar with potential investors.

48.     In the second video, entitled "Educational Preview About Airwaves Presentation" and also referred to as the "10-Minute Spectrum Preview," Maerki again repeatedly touted the potential of the 800 MHz spectrum.  For example, Maerki represented that: "Obviously, Sprint will be the very apparent candidate for us to lease the 800 megahertz spectrum within [sic] interruption immediately after having relinquished it to the FCC."  He also represented: "According to recent analytical models, by owning an 800 megahertz license, one may achieve an annual income up to 300 percent or more while sharing the license with a major wireless carrier."

49.     Maerki emailed this video to potential investors and, at Alcorn's request, Maerki sent the video to Fundraising Entities to use to solicit investors.

50.     Alcorn and Maerki also attended a live presentation for potential investors in Premier Spectrum Group hosted by Jones at which Maerki misrepresented that the 800 MHz Expansion Band and Guard Band could be used by Sprint.  At that presentation, Maerki stated "We have two of our licenses.  We will have more and ultimately we will have all 25.  Everybody will have their licenses....If you hire us, we will go talk to Sprint and make a deal.  That's what we can guarantee.  We can't guarantee anything else."

51.     In 2012, Alcorn and Maerki received questions from potential investors, indicating that the 800 MHz spectrum in the Expansion Band and Guard Band may not be able to be used by major wireless carriers.  Some of these potential investors raised questions regarding the feasibility of leasing or selling the spectrum to major wireless carriers after speaking with FCC representatives.  Despite these questions, Alcorn and Maerki did not follow up on these questions and never spoke to anyone at the FCC about whether major wireless carriers could use the Expansion Band and Guard Band of the 800 MHz spectrum.  They simply continued to market the spectrum licenses as tremendously valuable to major wireless carriers.

52.     Alcorn and Maerki made these misrepresentations even though they knew, or were reckless or negligent in not knowing, that the statements were false.

Both knew, or were reckless or negligent in not knowing, that major wireless carriers cannot use this particular spectrum to operate their cellular systems.  Instead, this spectrum is most typically used for small scale push-to-talk services, such as those used by local law enforcement or small businesses such as pizza delivery companies.

53.     In 2010, two years before the first securities offering, a Sprint representative told Alcorn that Sprint would not be able to use the spectrum for which Janus Spectrum was applying because of FCC restrictions.  Alcorn was again advised of this important limitation in 2011, a year before the first securities offering, when Janus Spectrum's primary engineer told Alcorn that he did "not see Sprint being a customer for a long time."

54.     Both Alcorn and Maerki received questions from potential investors indicating that the 800 MHz spectrum in the Expansion Band and Guard Band may not be able to be used by major wireless carriers.  Nevertheless, they failed to follow up on this information and continued to market the spectrum licenses as tremendously valuable to major wireless carriers.

55.     During the relevant time period, Alcorn and Maerki were owners and managers of Janus Spectrum; thus, their knowledge of the falsity of their representations is imputed to Janus Spectrum.

56.     Alcorn's and Maerki's misrepresentations and omissions were material. Investors considered the ability to lease or sell the 800 MHz spectrum obtained by Janus Spectrum to major wireless carriers important to their decision to invest in the scheme.  Knowing that the 800 MHz spectrum in the Expansion Band and Guard Band could not be used by major wireless carriers, such as Sprint, affected investors' likelihood and ability of obtaining a return on their investments.  The technical limitations of the Expansion Band and Guard Band meant they could not be used by major wireless carriers, but instead only by small businesses, greatly diminishing the value of the licenses.

///

### 3.      The Role of the Fundraising Entity Defendants in the scheme

57.      With Janus Spectrum's support, the Fundraising Entities offered investors the opportunity to become members in a limited liability company, or "LLC," or in a private membership association, or "PMA," by purchasing membership interests.  The Fundraising Entities pooled investor funds received from the sale of these membership interests.

58.      A significant portion of the investor funds raised by the Fundraising Entities was funneled to Janus Spectrum.  From May 2012 to October 2014, Janus Spectrum received at least $6,834,700 from the Fundraising Entities.

59.      The Fundraising Entities used a portion of the funds to purchase license preparation and submission services from Janus Spectrum for applications in specific geographic areas.

60.      The Fundraising Entities represented to investors that Janus Spectrum would handle all aspects of the application process and that Janus Spectrum and the Fundraising Entities would manage the FCC licenses and negotiate deals on their behalf.

### a.      The Bank Defendants' securities offerings

61.      From September 2012 through October 2014, Bank's three Dominion Private Client Group offerings—Janus Spectrum Group, Spectrum 100, and Prime Spectrum—raised a total of approximately $8,194,600 from 111 investors nationwide.

62.      The structure of all three offerings was nearly identical.  Dominion Private Client Group and the respective issuer LLCs, Janus Spectrum Group, Spectrum 100, and Prime Spectrum, each offered LLC membership interests.  Spectrum Management, Spectrum 100 Management, and Prime Spectrum Management managed the offerings as the managing member.  Pursuant to the issuers' operating agreements, Spectrum Management, Spectrum 100 Management, and Prime Spectrum Management had "complete power and authority for the

13

1   management and operation of the [issuer's] assets and business…"

2       63.    Dominion Private Client Group, the three issuer LLCs, and Bank

3   solicited investors nationwide both directly and through salespeople.

4       64.    Potential investors received offering-specific documents for the three

5   Dominion Private Client Group spectrum offerings managed through Dominion

6   Private Client Group, Spectrum Management, Spectrum 100 Management, and Prime

7   Spectrum Management.  The offering documents represented that the three issuer

8   LLCs would apply for and obtain FCC spectrum licenses using Janus Spectrum's

9   application services.  Bank was the primary preparer of the offering documents and,

10  as principal and managing member of his respective Fundraising Entities, Bank had

11  ultimate authority over the offering documents' content and whether and how to

12  communicate that content to potential investors.

13      65.    Bank also hosted a radio show, aired on public radio stations and

14  available on YouTube, during which he spoke about the spectrum investment

15  opportunity in general and interviewed Alcorn and Maerki.

16      66.    In addition, Bank recorded a video presentation about the spectrum

17  opportunity, which was also uploaded to YouTube.  Bank appeared in the video

18  presentation and, after giving an introduction in which he stated that "[t]here is an

19  opportunity, which is what Kent is going to talk about today, where . . . we can

20  actually invest in those airwaves," he then played the "Money from Thin Air" video

21  which misrepresented the potential of 800 MHz spectrum in the Expansion Band and

22  Guard Band and misled investors regarding the use of this spectrum by major

23  wireless carriers.

24      67.    Many of the investors in the three Dominion Private Client Group

25  spectrum offerings were unsophisticated, did not have a technical background or

26  understanding of spectrum, and did not have any substantial role in preparing the

27  applications or involvement in the entities in which they bought membership

28  interests.  Investors were entirely dependent on the information and efforts of Janus

Spectrum and Bank's respective Fundraising Entities.

68.     Bank, Dominion Private Client Group, and the three issuer LLCs, Janus Spectrum Group, Spectrum 100, and Prime Spectrum, and the three managing member LLCs, Spectrum Management, Spectrum 100 Management, and Prime Spectrum Management, engaged in multiple deceptive acts that furthered the fraudulent investment scheme.  In addition to disseminating misleading information to investors, Bank transferred almost $4.5 million in investor funds raised through the three entities to his personal and other business accounts, and concealed this information from investors.  Of this amount at least $1,339,681 went to Bank personally, and approximately $3,040,904 was sent to Dominion Private Client Group.  Bank also funneled almost $3.7 million of investor funds to Janus Spectrum.

69.     Bank knew, or was reckless or negligent in not knowing, that he committed deceptive acts in furtherance of the fraudulent scheme.  Bank controlled the bank accounts into which he funneled investor funds and from which he paid himself substantial amounts.

70.     During the relevant time period, Bank was the managing member of Janus Spectrum Group, Spectrum 100, and Prime Spectrum through his entities Spectrum Management, Spectrum 100 Management, and Prime Spectrum Management; thus, his knowledge that he committed deceptive acts in furtherance of the fraudulent scheme is imputed to his respective Fundraising Entities.

### b.     Jones' Premier Spectrum Group offering

71.     From January 2013 to October 2013, Jones' Premier Spectrum Group offering raised approximately $407,050 from 13 investors nationwide.

72.     Premier Spectrum Group, Jones, and his salesperson directly solicited investors nationwide through the company's website (which was not password protected), webinars, live presentations and email.

73.     Premier Spectrum Group and Jones held webinars in which he appeared and, after giving an introduction in which he stated "Kent [Maerki] will share with

you this evening his past and bring you up to speed on the present," he then played the "Money from Thin Air" video which misrepresented the potential of 800 MHz spectrum in the Expansion Band and Guard Band and misled investors regarding the use of this spectrum by major wireless carriers.  Potential investors learned about these webinars through emails that Jones sent them.  Following the webinar, Jones sent emails to potential investors reiterating his prior misrepresentations regarding the purported 800 MHz spectrum opportunity.

74.    In addition, Jones hosted at least one live presentation to solicit investors.  Alcorn and Maerki attended the presentation and Maerki was the main presenter.  Jones also solicited potential investors by sending a standard email describing the spectrum opportunity to a list of people with whom he had no prior relationship.

75.    Potential investors received an offering document for the Premier Spectrum Group offering.  Jones was the primary preparer of the offering document and, as founder and trustee of Premier Spectrum Group, Jones had ultimate authority over the offering document's content and whether and how to communicate that content to potential investors.

76.    Investors purchased membership units in Premier Spectrum Group, a private membership association.  Upon purchasing membership units, an investor became a member in the association.  Investors were told that the private membership association would apply for and obtain FCC spectrum licenses through Janus Spectrum.

77.    Many of the investors in Jones' offering were unsophisticated and thereby dependent on Janus Spectrum and Premier Spectrum Group's information and efforts to monetize the spectrum opportunity presented by Jones, Premier Spectrum Group, and Janus Spectrum.

78.    Jones and Premier Spectrum Group engaged in multiple deceptive acts that furthered the fraudulent investment scheme.  In addition to disseminating

misleading information to investors, Jones transferred at least $55,000 in investor funds raised through Premier Spectrum Group to accounts he controlled, and concealed this information from investors.  Jones paid himself approximately $47,160 in commissions and paid a salesperson approximately $8,400 in commissions.  Jones also sent approximately $350,000 in investor funds to Janus Spectrum.  Jones received undisclosed referral fees totaling $567,140 from Janus Spectrum for introducing other potential fundraising entities and persons, namely Daryl Bank, to the spectrum opportunity and to Janus Spectrum's services.  These referral fees further incentivized him to raise money and funnel investor funds to Janus Spectrum.

79.   Jones knew, or was reckless or negligent in not knowing, that he committed deceptive acts in furtherance of the fraudulent scheme.  Jones controlled the bank accounts into which he funneled investor funds and from which he paid himself substantial amounts.

80.   During the relevant time period, Jones was the founder and trustee of Premier Spectrum Group; thus, his knowledge that he committed deceptive acts in furtherance of the fraudulent scheme is imputed to Premier Spectrum Group.

### c.     The Johnson/Chadwick Defendants' securities offerings

81.   From December 2012 to October 2013, Johnson and Chadwick raised approximately $3,859,600 through at least three spectrum offerings of membership interests issued by Innovative Group, Premier Group, and Prosperity Group from 201 investors nationwide.

82.   Johnson and Chadwick solicited potential investors by email and word of mouth.  Johnson and Chadwick also held conference calls and hosted live presentations and in-person meetings with potential investors, some of which were attended by Alcorn and Maerki.  The email invitations for these conference calls and presentations were sent to prior investors, but the emails encouraged the recipients to invite "anyone who might be interested."  Jones, who was acquainted with Johnson and Chadwick, also solicited potential investors for Innovative Group.

17

83.     Investors purchased membership interests in Innovative Group, Premier Group, or Prosperity Group, all private membership associations.  Upon purchasing membership interests, an investor became a member in the association and would have a percentage ownership in the applications.

84.     Similar to the investors in the other offerings, many of the investors in Johnson and Chadwick's offerings were unsophisticated and also dependent on Janus Spectrum and Innovative Group, Premier Group, and Prosperity Group's information and efforts.

85.     Johnson, Chadwick, Innovative Group, Premier Group, and Prosperity Group engaged in multiple deceptive acts that furthered the fraudulent investment scheme.  In addition to disseminating misleading information to investors, the Johnson/Chadwick Defendants transferred at least $103,459 and $93,024, respectively, to accounts they controlled, concealing those transfers from investors. Johnson and Chadwick also funneled approximately $2,785,000 in investor funds to Janus Spectrum.  Johnson and Chadwick also received at least $260,000 in referral fees from Janus Spectrum for referring clients to Janus Spectrum, which further incentivized them to raise money and send investor funds to Janus Spectrum.

86.     Johnson and Chadwick knew, or were reckless or negligent in not knowing, that they committed deceptive acts in furtherance of the fraudulent scheme. Johnson and Chadwick controlled the bank accounts into which they funneled investor funds and from which they paid themselves substantial amounts.

87.     During the relevant time period, Johnson and Chadwick were the co-founders of Innovative Group, Premier Group, and Prosperity Group; thus, their knowledge that they committed deceptive acts in furtherance of the fraudulent scheme is imputed to their respective Fundraising Entities.

///

///

///

### 4.   The Fundraising Entity Defendants' material misrepresentations and omissions

#### a.   The Bank and Jones offering materials

88.   Bank and Jones made misrepresentations and omitted material facts in Dominion Private Client Group's offering documents for the Janus Spectrum Group, Spectrum 100, and Prime Spectrum offerings and in Premier Spectrum Group's offering documents.

89.   These entities did not use standard private placement memoranda. Instead, each offering had a short, approximately 20-page, offering document generally describing the investment opportunity.

90.   Bank's entities, Dominion Private Client Group, Janus Spectrum Group, Spectrum 100, and Prime Spectrum, used offering documents explaining that Dominion Private Client Group "has partnered with Janus Spectrum and its team" to apply for FCC spectrum licenses.

91.   These offering documents falsely stated that "[t]oday this targeted 800 MHz Spectrum is among the most coveted Spectrum to wireless carriers….We anticipate ownership of this valuable, lower band spectrum will provide [Janus Spectrum Group, Spectrum 100, Prime Spectrum,] with opportunities for capital appreciation—as the value of spectrum rises over time; and, attractive income opportunities through a lease or joint-venture arrangement with one or more wireless service provider."

92.   The offering documents that Jones used for the Premier Spectrum Group offering made a virtually identical misrepresentation.

93.   Both Bank and Jones' offering documents, however, failed to disclose that Janus Spectrum was only applying for spectrum in the 800 MHz Expansion Band and Guard Band, which could not be used by major wireless carriers for their cellular systems.

94.   Bank knew, or was reckless or negligent in not knowing, that the

19

representations regarding the use of the 800 MHz spectrum were false and material information had been omitted, rendering the representations misleading. Bank developed suspicions and concerns about the investment based on Maerki's mismanagement of other offerings, lack of communication, and unwillingness to provide updates or answer questions. Bank had no basis upon which to represent that the 800 MHz spectrum was "coveted" by wireless carriers aside from Maerki's and Alcorn's representations. But Bank did not address his concerns and suspicions, choosing to continue marketing the spectrum licenses as profitable and to repeat misrepresentations in order to solicit investors.

95.     Jones also knew, or was reckless or negligent in not knowing, that the representations regarding the use of the 800 MHz spectrum were false and material information had been omitted, rendering the representations misleading. Jones received a number of questions from potential investors' asking about FCC rules limiting the ability of major wireless carriers to use 800 MHz spectrum in the Expansion Band and Guard Band. But he never conducted any follow-up research even though he realized such restrictions would be cause for concern and would "make a difference in the applications." Instead, he chose to continue soliciting investors with promises that the 800 MHz spectrum in the Expansion Band and Guard Band would be profitable because of its value to major wireless carriers. Jones even went so far as to promise investors "double-digit returns" based on the value of the 800 MHz spectrum in the Expansion Band and Guard Band.

96.     Bank's and Jones' misrepresentations and omissions were material because investors considered the representation that major wireless carriers would lease or purchase the 800 MHz licenses from Janus Spectrum important in deciding whether to invest.

97.     The offering documents of Bank, Jones and their respective entities also misrepresented how investor funds would be used.

98.     Bank's offering documents falsely stated that the investor funds raised

would be used for "the application and acquisition of the [FCC] applications and licenses." This representation was misleading because it failed to disclose that Bank kept a substantial portion of investor funds for his personal use. Specifically, he commingled investor funds with funds from his numerous other business ventures and used investor funds to pay himself and his salespeople undisclosed sales commissions ranging from twelve to sixteen percent.

99. Jones' offering documents falsely represented that "[e]ach membership unit includes the application, acquisition, and management of the FCC licenses," and Jones made a similar representation in his webinars. These representations were misleading because they failed to disclose that Jones used a portion of the investor funds raised to pay himself and his salesperson undisclosed commissions ranging from twelve to fourteen percent.

100. Bank and Jones knew, or were reckless or negligent in not knowing, that the representations and omissions regarding the use of investor proceeds were false and misleading because they controlled the bank accounts into which their respective investor funds were deposited and thus knew that they kept a substantial portion of investor funds for personal use.

101. Bank's and Jones' misrepresentations and omissions regarding the use of investor proceeds were material because it was important to investors, when deciding whether to enter into an investment, to know that Bank and Jones kept a portion of investor funds and used them for purposes other than FCC license applications.

102. During the relevant time period, Bank was the owner and manager of Dominion Private Client Group, Janus Spectrum Group, Spectrum Management, Spectrum 100, Spectrum 100 Management, Prime Spectrum, and Prime Spectrum Management, and Jones was the owner and manager of Premier Spectrum Group; thus, Bank's and Jones' knowledge of the falsity of their representations is imputed to their respective entities.

///

**b.    Use of the "Money from Thin Air" video**

103.   Bank, Jones, Johnson, and Chadwick all used the materially false and misleading "Money from Thin Air" video to solicit investors.

104.   Bank included the "Money from Thin Air" video as part of his video presentation on YouTube.

105.   Jones sent links to the "Money from Thin Air" video in solicitation emails to investors, and he played the video during a webinar he conducted.

106.   Johnson and Chadwick sent the "Money from Thin Air" video to potential investors.

107.   Jones, Johnson, and Chadwick each knew, or were reckless or negligent in not knowing, that the representations in the video concerning the use of the 800 MHz license by major wireless carriers were false.  Each of them ignored red flags created by questions from investors and potential investors regarding the ability of major wireless carriers to use the 800 MHz spectrum.

108.   Bank also knew, or was reckless or negligent in not knowing, that the representations in the video concerning the use of the 800 MHz license by major wireless carriers were false.  Although Bank had developed suspicions and concerns about the investment based on Maerki's mismanagement of other offerings, lack of communication, and unwillingness to provide updates or answer questions, Bank did not address his concerns and suspicions and continued to market the spectrum licenses as profitable.

109.   Bank's, Jones', Johnson's, Chadwick's and knowledge of the falsity of the representations in the video are imputed to their respective entities.

**c.    Solicitation emails sent by Jones, Johnson, and Chadwick**

110.   Jones, Johnson, and Chadwick also sent solicitation emails to investors which contained misrepresentations.

111.   Jones solicited potential investors through emails that falsely claimed

"[t]his particular opportunity has [a] **double-digit** return on Membership projected monthly within the next 24 months." (emphasis in original).  The representation regarding "double-digit return" was false because the 800 MHz spectrum for which Janus Spectrum was applying could not be used by major wireless carriers to operate their cellular systems.

112.   Johnson and Chadwick made misrepresentations and omitted material facts in emails to investors.  In a solicitation email that went to potential investors in the Innovative Group offering, Johnson and Chadwick falsely stated "[a] little more detail on the 800mhz spectrum that is being released to the public via 02-55 here….Once re-banding is complete and the public notices go out and we receive our licenses, our plan is to go back to Sprint and negotiate a lease back to them."  In this email, Johnson and Chadwick failed to disclose that 800 MHz spectrum in the Expansion Band and Guard Band could not be used by major wireless carriers for their cellular systems.

113.   In addition, in a recent email sent to an Innovative Group investor on November 14, 2014, Johnson and Chadwick falsely blame the lack of interest from major wireless carriers on the limited number of licenses received, stating, "[w]e are not getting interest from cell phone companies with only two markets.  It is apparent that we need more licenses to get their attention. . . . Until then we have to manage and monetize them [as] best as possible as we acquire them."

114.   Jones, Johnson, and Chadwick each knew, or were reckless or negligent in not knowing, that their representations and omissions were false.  None of them investigated or researched the questions they received from investors and potential investors regarding the ability of major wireless carriers to use the 800 MHz spectrum.  Yet, they all continued to solicit investors by claiming that the licenses would be leased or purchased by major wireless carriers.

115.   Jones's, Johnson's, and Chadwick's knowledge of the falsity of their email representations are imputed to their respective entities.

**C.**     **Lack Of Securities Registration And Broker-Dealer Registration**

116.   During all relevant times, all of the offerings by the Fundraising Entities required the investment of money by investors who received a membership interest or membership unit upon investing.

117.   Each of the Fundraising Entities then pooled investor money and investors shared ownership in an LLC or private membership association.

118.   Many investors were unsophisticated and uninvolved in the FCC license application process.  Janus Spectrum and the Fundraising Entities represented to investors that they would apply for the licenses and work to negotiate deals to monetize the licenses on behalf of investors.  Moreover, the FCC license application process and the profitability of the licenses were dependent on the actions of the Defendants.  Accordingly, investors were completely reliant on Janus Spectrum and the Fundraising Entities for the investment's overall success.

119.   During all relevant times, all of the Fundraising Entities' offerings each made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices and courses of business alleged in this complaint.

120.   Bank and his respective Fundraising Entities solicited investors through, among other things, a radio show that was aired on public radio stations and YouTube and a video presentation that was uploaded to YouTube.

121.   Jones and Premier Spectrum Group solicited investors through, among other things, the entity's website (which was not password protected), webinars, and email.

122.   Johnson, Chadwick and their respective Fundraising Entities solicited investors through, among other things, emails and conference calls.

123.   During all relevant times, the Fundraising Entities' securities offerings were required to be registered under the securities laws.  None of the Fundraising Entities' securities offerings had a registration statement in effect or on file; thus,

1 | these offerings were not registered.

2 | 124.   All of the Fundraising Entities' securities offerings solicited investors

3 | nationwide.  Many of the investors in each of the Fundraising Entities' offerings were

4 | unsophisticated and there were at least several unaccredited investors in each

5 | offering.  The Bank Defendants, the Jones Defendants, and the Johnson/Chadwick

6 | Defendants took no steps to verify that investors were accredited.

7 | 125.   Bank had common control over all of the issuers, Dominion Private

8 | Client Group, Janus Spectrum Group, Spectrum 100, and Prime Spectrum.  Each

9 | issuer was engaged in the same type of business, offering membership interests and

10 | then using investor funds to try to obtain FCC spectrum licenses, and Bank

11 | disregarded entity form by using Dominion Private Client Group's name on each

12 | offering document.  In addition, all of the offerings were a part of a single plan of

13 | financing and for the same general purpose, which was to apply for FCC spectrum

14 | licenses through Janus Spectrum, they all sold the same type of securities,

15 | membership interests; the offerings overlapped for a period of time in 2013 and 2014;

16 | and all three received cash as consideration.

17 | 126.   Johnson and Chadwick controlled Innovative Group, Premier Group,

18 | and Prosperity Group; each issuer was engaged in the same type of business, offering

19 | membership interests and then using investor funds to try to obtain FCC spectrum

20 | licenses; and Johnson and Chadwick disregarded entity form by commingling

21 | investor money.  In addition, all three offerings sold the same type of securities,

22 | membership interests; the offerings occurred about the same time, overlapping in

23 | 2012 and 2013; and the same consideration, cash, was received from investors.

24 | 127.   Janus Spectrum, Alcorn, Maerki, Bank, Jones, Johnson, and Chadwick

25 | were not registered as broker-dealers as required by the federal securities laws.

26 | 128.   Janus Spectrum, Alcorn, Maerki, Bank, Jones, Johnson, and Chadwick

27 | acted as brokers because they actively solicited investors to purchase membership

28 | interests or units through one-on-one meetings, live presentations, video

presentations, a radio show, conference calls, or email. They described the merits of investing in spectrum to potential investors or answered investor questions.

129. Alcorn, Maerki, Bank, Jones, Johnson, and Chadwick each received compensation from investor funds. Bank and Jones each personally received a percentage of assets invested; Bank received $1,339,681 or approximately sixteen percent, and Jones received $47,160 or approximately fourteen percent. Alcorn, Maerki, Johnson and Chadwick did not receive a fixed percentage of assets invested, but simply took investor funds for personal use. Each received at least the following: $514,996 - Alcorn; $867,665 - Maerki; $103,459 - Johnson; $93,024 - Chadwick. In addition, Jones received a $567,140 referral fee from Janus Spectrum that was based, at least in part, upon his referral of Bank to Janus Spectrum.

## FIRST CLAIM FOR RELIEF

### Violations of Sections 17(a) of the Securities Act

### (Against All Defendants)

130. The SEC realleges and incorporates by reference paragraphs 1 through 129 above.

131. Defendants, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

        (a)     employed devices, schemes, or artifices to defraud;

        (b)     obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

132. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2)

and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

Violations of Section 10(b) of the Exchange Act and Rule 10b-5

(Against All Defendants)

133. The SEC realleges and incorporates by reference paragraphs 1 through 129 above.

134. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

135. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a-c) thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

Violations of Sections 5(a) and 5(c) of the Securities Act

(Against All Defendants)

136. The SEC realleges and incorporates by reference paragraphs 1 through 129 above.

137. Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the

27

purpose of sale or for delivery after sale.

138.   No registration statement has been filed with the SEC or has been in effect with respect to any of the offerings alleged herein.

139.   By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## FOURTH CLAIM FOR RELIEF

Violations of Section 15(a)(1) of the Exchange Act

(Against Janus Spectrum, Alcorn, Maerki, Bank, Jones, Johnson, and Chadwick)

140.   The SEC realleges and incorporates by reference paragraphs 1 through 129 above.

141.   Defendants Janus Spectrum, Alcorn, Maerki, Bank, Jones, Johnson, and Chadwick, by engaging in the conduct described above, made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security.

142.   During the relevant time period, Defendants Janus Spectrum, Alcorn, Maerki, Bank, Jones, Johnson, and Chadwick were not registered as a broker or dealer.

143.   By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78o(a)(1)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Janus Spectrum, Alcorn, Maerki, Bank, Jones, Johnson, and Chadwick, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78o(a)(1)].

## IV.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of

///
///
///
///

1  all orders and decrees that may be entered, or to entertain any suitable application or

2  motion for additional relief within the jurisdiction of this Court.

3  **VIII.**

4         Grant such other and further relief as this Court may determine to be just and

5  necessary.

6

7  Dated this 6th day of April, 2015.           Respectfully submitted,

8                                                    _/s/ Sam S. Puathasnanon_

9                                                Sam. S. Puathasnanon
                                               Sana Muttalib
10                                              Attorneys for Plaintiff
                                               Securities and Exchange Commission
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28