1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Securities and Exchange Commission,    )    No. CV-15-609-PHX-SMM
                                          )
10         Plaintiff,                      )
                                          )
11  v.                                     )    **ASSET FREEZE ORDER**
                                          )
12  Janus Spectrum LLC, et al.,            )
                                          )
13         Defendants.                     )
                                          )
14  _____    )

15         Pending before the Court is Plaintiff Securities and Exchange Commission's ("SEC")

16  notice of application and application for an asset freeze order.  (Doc. 88.)  The SEC applies

17  for an order to freeze the assets of Defendants Janus Spectrum LLC ("Janus Spectrum"),

18  David Alcorn ("Alcorn"), and David Alcorn Professional Corporation ("DAPC")

19  (collectively "Defendants").  The motion is fully briefed and the parties presented oral

20  argument to the Court.  (Docs. 94, 96-97, 99.)

21         The Court finds that the SEC has met the standard for obtaining an asset freeze and

22  will grant the SEC's motion.  The Court will require the Bankruptcy Trustee for the

23  Bankruptcy Court for the District of Arizona to turn over the assets of Debtor Janus Spectrum

24  LLC to the registry account of this Court pursuant to LRCiv 67.1.

25                              **BACKGROUND**

26         Defendants Janus Spectrum, David Alcorn, Kent Maerki, and the Fundraising Entity

27

28

Defendants,[1] are allegedly responsible for planning and operating an investment scheme to obtain and monetize FCC licenses that Alcorn and his accomplice, Maerki, knew or should have known had little value.  Alcorn founded Janus Spectrum in October 2011; it filed for bankruptcy in March 2014. (Doc. 89, Exhibits 2 and 7.)  Alcorn is also the president and sole owner of DAPC, an Arizona professional corporation that became the sole owner of Janus Spectrum in January 2014, before it filed for bankruptcy protection. (Doc. 89, Exhibits 8, 12.)

The FCC regulates wireless communications; it oversees the various frequencies that comprise the country's available wireless capacity or spectrum. (Doc. 88-1 at 10-11; Doc. 89, Exhibits 10, 11.) The FCC issues licenses to own and use various frequencies throughout the country. (Doc. 88-1 at 11.) In 2004, the FCC adopted a plan to reconfigure the 800 MHz wireless spectrum band. (Id.) Public safety operations were moved to the lower portion of the 800 MHz band and commercial wireless systems were moved to the higher portion of the band.  (Doc. 89, Exhibit 10.)  As part of its plan, the FCC designated the expansion band and guard band to maintain separation between public safety and cellular operations on the 800 MHz band.   (Doc. 89, Exhibit 11.)   FCC rules specify that a license using either the expansion band or the guard band is only authorized to use a maximum bandwidth of 20 kHz. (Id.)  Major wireless carriers require a minimum bandwidth of 1.25 to 1.4 MHz.  (Id.)  Major wireless carriers could not operate their cellular services on the 800 MHz expansion band or guard band because those cellular services would not fit within the FCC's authorized maximum bandwidth of 20 kHz. (Id.)

The SEC alleges that Janus Spectrum operated as a business seeking to obtain and

---

[1]The Fundraising Entity Defendants include Daryl G. Bank; Dominion Private Client Group, LLC; Janus Spectrum Group, LLC; Spectrum Management, LLC; Spectrum 100, LLC; Spectrum 100 Management, LLC; Prime Spectrum, LLC; Prime Spectrum Management, LLC; Bobby D. Jones; Premier Spectrum Group, PMA (Doc. 105 at 5); and also include the Settling Defendants Terry W. Johnson; Raymon G. Chadwick, Jr.; Innovative Group, PMA; Premier Group, PMA; and Prosperity Group, PMA.  (Docs. 107-111.)

resell FCC licenses in the expansion and guard band. (Doc. 88-1 at 11.) Janus Spectrum held itself out as a company that prepares applications for FCC cellular spectrum licenses on behalf of third-party clients, which included individuals and fundraising entities. (Doc. 89, Exhibit 12.)  Janus Spectrum's business involved offering and providing FCC license application services to over 20 fundraising entities, which Janus Spectrum called "clients." (Doc. 89, Exhibit 13.) These application services included working with third parties, such as engineers and attorneys, to prepare and file spectrum applications with the FCC for 800 MHz spectrum licenses in the expansion and guard band. (Doc. 89, Exhibits 13-14.)

The SEC alleges that Janus Spectrum's business also involved encouraging investors to invest in the fundraising entities. (Doc. 105 at 10-11.) According to the SEC, Janus Spectrum, Alcorn, and Maerki, structured the business relationships and written agreements with the fundraising entities to avoid the appearance that Janus Spectrum was offering securities. (Doc. 89, Exhibits 14-15; see also Doc. 97-3.) Janus Spectrum and Alcorn relied on the fundraising entities to offer membership interests in an attempt to shield themselves from registration requirements and potential liability associated with offering securities. (Doc. 89, Exhibit 15.)

The SEC alleges that the Fundraising Entity Defendants solicited investors to invest in entities by entering into investment contracts. Investors received membership interests in exchange for their investment. (Doc. 89, Exhibit 14.)  The SEC alleges that the entities then used a small portion of investor money to apply for FCC spectrum licenses, pocketing or sending Janus Spectrum the remainder of the money. (Doc. 89, Exhibits 14, 15.) Investors were told that once the entities obtained the licenses, they could expect profits derived from selling or leasing the licenses to major cellular companies. (See Doc. 89, Exhibit 14.)

Janus Spectrum and Alcorn solicited and referred potential investors to the Fundraising Entity Defendants. (Doc. 89, Exhibits 19-23.)  Alcorn also emailed and met with investors, answered investor questions, and encouraged the Fundraising Entity Defendants to use him and Maerki to close sales. (Doc. 89, Exhibits 19-22.) Janus Spectrum and Alcorn played an active role in promoting the sale of the membership interests by providing

promotional videos for use in soliciting investors using such titles as "Money From Thin Air," assisting with drafting marketing materials, providing sample offering documents, training salespeople, participating in investor presentations or meetings for each fundraising entity, answering potential investors questions, and making investor referrals to the fundraising entities. (Doc. 89, Exhibits 16-23, 26, 30.)

The SEC alleges that Alcorn received information from Janus Spectrum's primary engineer and a Sprint representative, and both he and Maerki received questions and advice from third parties, indicating that the 800 MHz spectrum in the expansion and guard band could not be used by major wireless carriers. (See Doc. 89, Exhibit 12 at 339-41, Exhibit 24, Exhibit 25 at 42-46, and Exhibit 44.) The SEC alleges that Janus Spectrum and Alcorn failed to follow up on this information and continued to market to investors that the spectrum licenses as tremendously valuable to major wireless carriers. (Doc. 105 at 10-13.)

Janus Spectrum sold each application for $40,000. (Doc. 89, Exhibit 38.) The SEC alleges that Janus Spectrum, Alcorn, and Maerki misrepresented to investors that the majority of the application costs were used to pay overhead and fees associated with the preparation and filing of the applications. (See id.) In reality, the SEC alleges that the cost of preparing and filing an FCC license application was significantly less than the amount Janus Spectrum was charging per application. (See Doc. 89, Exhibits 26-27, 38, 43.)

The SEC alleges that Defendants raised over $12.4 million dollars from hundreds of investors. (Doc. 89 at 2.) The SEC further alleges that Janus Spectrum, Alcorn, and Maerki funneled investor funds to themselves. From May 2012 to October 2014, Janus Spectrum received at least $6,834,700 of investor funds from the Fundraising Entity Defendants. (Id.) Of that amount, DAPC received approximately $3.1 million, Alcorn received at least $514,996, and Maerki received at least $867,665 of the investor funds. (Id.) According to the SEC, the FCC licenses obtained have not earned any money.

On March 3, 2014, Janus Spectrum filed for relief under Chapter 11 of the United States Bankruptcy Code. (Doc. 89, Exhibit 2.) In re: Janus Spectrum LLC, Case No. 2:14-bk-02682-GBN, is pending in the United States Bankruptcy Court for the District of

1   Arizona.  Until July 2015, when the bankruptcy court appointed a Chapter 11 Trustee to

2   administer the case, Janus Spectrum operated its business as debtor-in-possession under the

3   management of Alcorn. (Doc. 89, Exhibit 2.)  Alcorn was both the debtor's responsible

4   person in charge of the bankruptcy and its sole principal. (Id.)

5            The SEC alleges that Janus Spectrum did not seek bankruptcy court approval to pay

6   any estate funds to Alcorn until September 8, 2014, when it filed a motion to have the estate

7   assume an executory contract with Alcorn, which purportedly justified those payments. (Doc.

8   89, Exhibit 6 (Bk. Doc. 142).) By September 8, 2014, Alcorn had paid himself $474,638 in

9   "commissions" from estate funds. (Doc. 89, Exhibit 4 (showing multiple payments to DAPC

10  as "Commissions").  He then paid himself an additional $184,593 in estate funds between

11  the filing of the motion and the hearing on that motion which took place on January 28, 2015.

12  (Doc. 89 at 2, and Doc. 89, Exhibit 4 (Bk. Docs. 174, 192, 200).) The bankruptcy court

13  denied the motion at the hearing, and Janus Spectrum, three months later, filed another

14  motion requesting that the court assume a new contract to justify the payments. (Doc. 89,

15  Exhibit 28.) While the new motion was pending, Alcorn paid himself an additional $147,932

16  from estate assets without the court's authorization. (Doc. 89 at 2 and Exhibit 4 (Bk. Docs.

17  230, 267, 278, 311).)  In total, from April 2014 to May 2015, and all without court approval,

18  Alcorn paid himself $807,143 from estate assets. (SEC's Response to Chapter 11 Trustee's

19  Motion to Dismiss Bankruptcy Case, In re: Janus Spectrum LLC, No. 2:14-bk-02682-GBN,

20  (Bankr. D. Ariz. Dec. 22, 2015) (Doc. 341).  The estate now holds only $324,092.75. (Doc.

21  89, Exhibit 3 at 5 (Bk. Doc. 333).)

22          The bankruptcy court ultimately denied the motion to assume an executory contract

23  with Alcorn based on its finding that there was not enough evidence showing that Alcorn's

24  retention and compensation benefitted the bankruptcy estate. (Doc. 89, Exhibit 5.) During

25  oral argument on June 25, 2015 relating to the motion, the court denied the motion, it also

26  appointed the Chapter 11 Trustee, finding the operation of the debtor unacceptable. (Id.)

27          Subsequently, the Chapter 11 Trustee filed a motion to dismiss the bankruptcy

28  proceeding.  (Doc. 89, Exhibit 3.)  Among the reasons was her concern that the debtor was

operating a business which may later be found to be unlawful.  (Id.)  The Trustee further stated in her motion that she "quickly concluded that in light of the serious SEC allegations that Debtor's fundamental business model was unlawful and Debtor [was] a knowing or negligent participant in a fraudulent scheme, operating the Debtor was not a viable option" and acknowledged that all of the revenues generated by the Debtor's business would be subject to disgorgement. (Id., Exhibit 3 at 3, 4 (Bk. Doc. 333 at 3, 4).)

**STANDARD OF REVIEW**

*Motion for Asset Freeze*

"[F]ederal courts have inherent equitable authority to issue a variety of ancillary relief measures in actions brought by the SEC to enforce the federal securities laws." S.E.C. v. Wencke, 622 F.2d 1363, 1369 (9th Cir. 1980) (further citation omitted).  The power to grant a preliminary injunction which freezes assets is among the district court's inherent equitable powers. S.E.C. v. Int'l Swiss Invs. Corp., 895 F.2d 1272, 1276 (9th Cir. 1990).  The purpose of an asset freeze is to prevent the dissipation and waste of assets so that they will be available for disgorgement. S.E.C. v. Hickey, 322 F.3d 1123, 1132 (9th Cir. 2003)

A party seeking an asset freeze must first show that it is likely to succeed on the merits of its claims. Federal Sav. & Loan Ins. Corp. v. Sahni, 868 F.2d 1096, 1097 (9th Cir. 1989), overruled on other grounds, Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009).

Next, the party must also show "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." Johnson, 572 F.3d at 1085.  In Johnson, citing the intervening ruling in Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008), the Ninth Circuit overruled the "possibility of dissipation" standard previously established by the court in Sahni for an asset freeze. Johnson, 572 F.3d at 1081, 1085.  The Ninth Circuit cited the Winter's Court clarification that the "possibility" standard was too lenient, and that plaintiffs must demonstrate that irreparable injury is likely, not just possible, in the absence of an injunction). Accord S.E.C. v. Schooler, 902 F. Supp. 2d 1341, 1359 (S.D. Cal. 2012) (rejecting possibility of dissipation as the standard for an asset freeze, and stating that according to Johnson, likelihood of

1    dissipation is the proper standard that must be met for an asset freeze).

2                                    **DISCUSSION**

3        The SEC first alleges that an asset freeze is needed over the assets of Janus Spectrum

4    and Alcorn in order to preserve investor funds.  (Doc. 88-1 at 17.)  Continuing, the SEC

5    argues that given that the Chapter 11 bankruptcy trustee seeks to dismiss Janus Spectrum's

6    bankruptcy proceeding and thus lift the stay that is preserving the remaining assets, an asset

7    freeze is necessary to ensure that Defendants do not dissipate or secrete their assets pending

8    final judgment and to ensure that the victims of this alleged securities fraud receive some

9    compensation.  (Id.)

10        *Asset Freeze*

11        A party seeking an asset freeze must first show that it is likely to succeed on the merits

12   of its claims.  Sahni, 868 F.2d at 1097.  In its complaint, the SEC argues that it is likely to

13   succeed on the merits of its claims against Janus Spectrum and Alcorn regarding both

14   Securities Act violations and Exchange Act violations.  (Doc. 88-1 at 18.)

15                        Section 5 Registration Allegations

16        The SEC alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act,

17   15 U.S.C. § 77e(a) and (c).  (Doc. 88-1 at 18-20.)  The SEC argues that Defendants violated

18   the Securities Act because Section 5 prohibits the direct or indirect offer or sale of securities

19   unless a registration statement is in effect.  (Id.)

20        Defendants contend that the SEC did not allege in their Complaint that Janus

21   Spectrum and David Alcorn actually sold any securities or failed to register.  (Doc. 94 at 25.)

22   Therefore, Defendants contend that the registration provisions of the Securities Act are not

23   relevant.  (Id.)

24        The SEC counters that its complaint unequivocally alleges that Defendants Janus

25   Spectrum and Alcorn violated Section 5 of the Securities Act.  (See Doc. 96 at 6-7, citing

26   Doc. 1 at 28-29.)

27        The Court agrees with the SEC that its complaint unequivocally alleges that

28   Defendants Janus Spectrum and Alcorn violated Section 5 of the Securities Act.  (Doc. 1 at

1    28-29.)  At issue is whether the SEC is likely to succeed on the merits of its Section 5 claims

2    against Janus Spectrum and Alcorn.

3            A *prima facie* Section 5 registration violation is established by a showing that: (1) no

4    registration statement was in effect or had been filed as to the securities; (2) the defendants,

5    directly or indirectly, sold or offered to sell the securities; and (3) the defendants' sale used

6    interstate facilities or the mails.  See S.E.C. v. Phan, 500 F.3d 895, 901 (9th Cir. 2007).  Once

7    the SEC introduces evidence that defendants have violated the registration provisions, the

8    burden shifts to the defendants to show that an exemption applies. See S.E.C. v. Murphy, 626

9    F.2d 633, 641 (9th Cir. 1980).  Section 5 liability extends to those who are "both a necessary

10   participant and a substantial factor in the sales transaction[s]." Phan, 500 F.3d at 906.  The

11   test is "whether, but for the defendant's participation, the sale transaction would not have

12   taken place."  Murphy, 626 F.2d at 651–52.  The defendant's acts must have been more than

13   *de minimis*. Id.

14           Under the Securities Act, "security" is defined as including any "note," any

15   "investment contract," or any "instrument commonly known as a 'security.'" See 15 U.S.C.

16   §§ 77b(a)(1). The Supreme Court articulated a test for whether a particular scheme is an

17   investment contract in S.E.C. v. W.J. Howey Co., 328 U.S. 293, 301 (1946). Under the

18   Howey test, courts look to "'whether the scheme involves an investment of money in a

19   common enterprise with profits to come solely from the efforts of others.'" S.E.C. v.

20   Edwards, 540 U.S. 389, 393 (2004) (quoting Howey, 328 U.S. at 301).

21           For the purpose of determining whether the SEC is likely to prevail on the merits of

22   its Section 5 allegations, the Court finds that the membership interests/units offered and sold

23   by the Fundraising Entity Defendants are securities.  The Court further finds that the

24   membership interests/units offered and sold satisfy the Howey test because the investors

25   invested money in the Janus Spectrum enterprise for what defendants called a "minimal

26   involvement" investment and the investors relied completely upon the defendants for any

27   alleged profits.  It is undisputed that the offer and sale of these securities was never registered

28   with the SEC.

1    Next, the Court finds that even though Janus Spectrum and Alcorn did not directly
2  offer or sell securities, they indirectly offered and sold securities because they were both "a
3  necessary participant and substantial factor" in all of the Fundraising Entities' offerings.
4  While the Fundraising Entity Defendants actually issued the securities, Janus Spectrum and
5  Alcorn were both necessary participants and substantial factors regarding all of the offerings.
6  Indeed, the investment offers would not have occurred but for the efforts of these
7  Defendants. Defendants were actively involved in promoting the offerings, meeting with or
8  contacting investors directly and referring investors to the Fundraising Entity Defendants.
9  Defendants promoted the investment offerings with the "Money from Thin Air" video they
10 created, marketing materials they drafted, sales staff they trained, and investor presentations
11 or meetings they led or attended.

12    Based on this factual record, the SEC is likely to prevail on the merits of its
13 allegations that Defendants violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §
14 77e(a) and (c).

15                    Section 15 Broker Registration Allegations

16    The SEC alleges that Defendants violated Sections 15(a)(1) of the Exchange Act, 15
17 U.S.C. § 78o(a)(1).  (Doc. 88-1 at 20-21.)  The SEC argues that Defendants violated the
18 Exchange Act because Section 15(a)(1) makes it unlawful for a broker or dealer "to make
19 use of the mails or any means or instrumentality of interstate commerce to effect any
20 transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless
21 registered with the SEC in accordance with Section 15(b).  (Id.)

22    Although Defendants contend that the SEC did not allege this violation in their
23 Complaint, the SEC disagrees.  (Doc. 94 at 25; Doc. 1 at 29.)  At issue is whether the SEC
24 is likely to succeed on the merits of its Section 15(a) claim against Janus Spectrum and
25 Alcorn.

26    Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged
27 in the business of effecting transactions in securities for the account of others."  15 U.S.C.
28 § 78c(a)(4)(A).  Activities that indicate a person may be a "broker" are: (1) solicitation of

1   investors to purchase securities, (2) involvement in negotiations between the issuer and the

2   investor, and (3) receipt of transaction-related compensation.  See S.E.C. v. Earthly Mineral

3   Sols., Inc., No. 2:07-CV-1057, 2011 WL 1103349, at *3 (D. Nev. Mar. 23, 2011).

4          For the purpose of determining whether the SEC is likely to prevail on the merits of

5   its Section 15 allegations, the Court finds Janus Spectrum and Alcorn acted as brokers

6   because they actively solicited investors to purchase membership interests in the Fundraising

7   Entity Defendants. The Court further finds that Alcorn met with investors, sent them emails,

8   and answered their questions. Alcorn also encouraged the Fundraising Entity Defendants to

9   use him to help close sales with investors. Thus, Defendants regularly participated in the

10  securities transactions at key points during the formation of these investments. They received

11  compensation for these transactions, allegedly involving hundreds of thousands of dollars of

12  investor money.

13         Based on this factual record, the SEC is likely to prevail on the merits of its

14  allegations that Defendants violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. §

15  78o(a)(1).

16                      Section 17(a) and Section 10(b) Allegations

17         The SEC alleges that Defendants violated Section 17(a) of the Securities Act, Section

18  10(b) of the Exchange Act, and Rule 10b-5, 15 U.S.C. §§ 77q(a), 78j(b), and 17 C.F.R. §

19  240.10b-5.  (Doc. 88-1 at 21-22.)  Section 17(a), Section 10(b), and Rule 10b–5 forbid

20  making a material misstatement or omission in connection with the offer or sale of a security

21  by means of interstate commerce.  Phan, 500 F.3d at 907-08.  Violations of Section 17(a)(1),

22  Section 10(b) and Rule 10b–5 require scienter.  Id.  Violations of Sections 17(a)(2) and (3)

23  require a showing of negligence.  Id.

24         Defendants contest both scienter and materiality.  (Doc. 94 at 26-28.)  Defendants

25  state that Janus Spectrum and Alcorn did not intend to deceive. (Id.) Here, Alcorn provides

26  that he and his family and friends purchased the same license applications services that the

27  SEC alleged are fraudulent. (Id.) Alcorn states his financial future is dependent upon

28  ownership of these same licenses. (Id.)  Further, Alcorn argues that materiality is lacking as

1    the spectrum can be and is being used for low density cellular traffic now. (Id.) According

2    to Defendants, the spectrum is far from worthless and will increase in value over time as it

3    can connect machines to the cloud and carry data. (Id.)  Regarding causation, Defendants

4    argue that a person is liable for making a false or misleading statement only if he had

5    ultimate authority for that statement. (Id.)

6         The SEC contends that it has submitted substantial evidence of the Defendants' fraud.

7    (Doc. 96 at 8.) A spectrum's value relates to the profits that could be generated from using

8    it, and any limitations on how it can be used will reduce its value correspondingly. (Id.)

9    According to the SEC, the evidence demonstrates that in marketing their investment scheme

10   to prospective investors, Defendants represented that the FCC licenses at issue would be

11   highly profitable because Janus Spectrum could sell and lease the licenses to major wireless

12   carriers. (Id. (citing Alcorn email answering investor questions).)  The SEC also contends

13   that its evidence establishes that the 800 MHz spectrum licenses that Defendants were selling

14   have little value. (See Doc. 89, Exhibits 11, 12, 25 and 44.) As the evidence shows, unlike

15   the broadband spectrum used by major cellular companies which can carry data, video and

16   voice transmissions, the narrow spectrum the Defendants applied for could only be used for

17   discrete purposes, such as push-to-talk, walkie-talkie-type radios used by dispatchers, and

18   machine-to-machine communications. (Doc. 96 at 8-9.)

19        Regarding scienter, the SEC notes that when Alcorn received a preliminary report

20   from a third-party firm engaged by Defendants which explained that multiple experts have

21   confirmed that reliance on this narrow spectrum for the majority of the return was not

22   feasible, he forwarded that assessment to his co-defendant and stated his one word reply,

23   "Oops." (Id. at 9.)  According to the SEC, such evidence shows that Alcorn was clearly

24   aware of such material misstatements; he knew that such severe limitations on the uses of the

25   spectrum they were selling made that spectrum worth only a small fraction of what they told

26   investors. (Id.)

27        Although there are factual disputes, based on the evidence presented, the Court finds

28   that the SEC is likely to prevail on the merits of its allegations that Defendants violated

1    Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Regulation

2    10b-5.  The Court finds that Defendants did make knowingly misleading statements when

3    they marketed the licenses to prospective investors.  Defendants created materials that

4    misleadingly told investors that once the licenses were obtained, they could expect profits

5    derived from those licenses being sold or leased to major cellular companies.  (Doc. 89,

6    Exhibit 14.)  They did this despite knowing that the 800 MHz spectrum in the Expansion and

7    Guard Band could not feasibly be used by major wireless carriers.  (Doc. 89, Exhibits 12, 24-

8    25, and 44.)  The Court finds that such misrepresentations were material to investors since

9    they concerned the fundamental, underlying value of the Janus Spectrum investments. See,

10   e.g., Murphy, 626 F.2d at 653 (stating that the materiality of information relating to financial

11   condition, solvency and profitability is not subject to serious challenge). The Court further

12   finds that Janus Spectrum and Alcorn solicited and referred potential investors to the

13   Fundraising Entity Defendants. (Doc. 89, Exhibits 19-23.)

14       Based on the entire factual record, the SEC is likely to prevail on the merits of its

15   allegations that Defendants violated Section 17(a) of the Securities Act, Section 10(b) of the

16   Exchange Act, and Rule 10b-5, 15 U.S.C. §§ 77q(a), 78j(b), and 17 C.F.R. § 240.10b-5.

17       *Dissipation of Assets*

18       In order to be entitled to an asset freeze, the SEC must also show "a likelihood of

19   dissipation of the claimed assets, or other inability to recover monetary damages, if relief is

20   not granted." Johnson, 572 F.3d at 1085.

21       The SEC alleges that such dissipation of assets has already occurred.  (Doc. 88-1 at

22   22-24.)  According to the SEC, the Chapter 11 bankruptcy trustee was appointed in Janus

23   Spectrum's bankruptcy case because of concerns about unauthorized payments from estate

24   assets to Alcorn, through DAPC, and Janus Spectrum's failure to abide by the bankruptcy

25   court's order requiring the disgorgement of funds paid without the court's approval to a law

26   firm. (Id.) The SEC alleges that during bankruptcy proceedings Alcorn disbursed $807,143

27   to DAPC from Janus Spectrum's estate without court approval, even though approval was

28   needed before disbursing those funds. (Id.) The SEC alleges that all of these funds were

1    investor proceeds received by Janus Spectrum. (Id.)

2        Defendants contend that the freeze sought would not accomplish the stated purpose,

3    protecting the license applicants and holders because the monies being held by the

4    bankruptcy trustee have been earmarked by Janus for the FCC application fees and frequency

5    coordinator services so that Janus Spectrum customers will obtain licenses when the FCC

6    opens those markets.  (Doc. 94 at 8.)  Thus, Defendants contend that the SEC, by causing a

7    freeze, would be harming the very customers it seeks to protect.  (Id.)

8        The Court finds that the SEC has shown a likelihood of dissipation of assets and that

9    further dissipation of assets will likely occur if an asset freeze is not granted.  The SEC has

10   shown that the estate of Janus Spectrum improperly paid David Alcorn and DAPC $807,143

11   during bankruptcy proceedings.  As a result of such irregularities, the Bankruptcy Court,

12   through Judge Nielsen, has stated that it intends to dismiss Janus Spectrum's Chapter 11

13   bankruptcy action. (Doc. 102.) Without action by this Court, such a dismissal would revest

14   control of remaining estate monies back into the control of David Alcorn and DAPC, and

15   continued dissipation.

16       The Court finds that the SEC has shown a likelihood of dissipation of the claimed

17   assets if an asset freeze is not granted.

18                                    **CONCLUSION**

19       Accordingly, on the basis of the foregoing,

20       **IT IS HEREBY ORDERED** granting the SEC's motion for asset freeze.  (Doc. 88.)

21       **IT IS FURTHER ORDERED** that Maureen Gaughan, the Trustee in the underlying

22   Bankruptcy proceeding before the United States Bankruptcy Court for the District of

23   Arizona, No. 2:14-bk-02682-GBN, shall deposit all monies, assets, and accrued interest

24   related to this bankruptcy matter now under her control and transfer such funds into this

25   Court's registry account pursuant to LRCiv 67.1. These funds are to remain undisturbed

26   absent this Court's Order.

27       **IT IS FURTHER ORDERED** that pending trial in this matter, except as otherwise

28   ordered by this Court, an immediate freeze shall be placed on all monies and assets (with an

allowance for necessary and reasonable living expenses to be granted only upon good cause shown by application to the Court with notice to and an opportunity for the SEC to be heard) in all accounts at any bank, financial institution or brokerage firm, or Internet or "e-commerce" payment processor, all certificates of deposit, and other funds or assets, held in the name of, for the benefit of, or over which account authority is held by Janus Spectrum, David Alcorn and/or David Alcorn Professional Corporation.

**IT IS FURTHER ORDERED** that, except as otherwise ordered by this Court, Janus Spectrum, David Alcorn and David Alcorn Professional Corporation, and their officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert with them, who receive actual notice of this Order, by personal service or otherwise, and each of them, be and hereby are restrained and enjoined, pending trial in this action, from, directly or indirectly, transferring, assigning, selling, hypothecating, changing, wasting, dissipating, converting, concealing, encumbering, or otherwise disposing of, in any manner, any funds, assets, securities, claims or other real or personal property, including any notes or deeds of trust or other interest in real property, wherever located, of any one of them, or their subsidiaries or affiliates, owned by, controlled by, managed by or in the possession or custody of any of them and from transferring, encumbering dissipating, incurring charges or cash advances on any debit or credit card of the credit arrangement of any one of them, or their subsidiaries and affiliates.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to the Chambers of United States Bankruptcy Judges for the District of Arizona, Hon. George B. Nielsen and the Honorable Daniel P. Collins, Chief Judge.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction over this action for the purpose of implementing and carrying out the terms of all orders entered.

DATED this 16th day of February, 2016.

Stephen M. McNamee
Senior United States District Judge